UNITED STATES of America,
Plaintiff-Appellant,

v.

Clifford Jerome MILLER and Kathelyn Vandraiss Miller, Defendants-Appellees.

UNITED STATES of America,
Plaintiff-Appellant,

v.

Clifford Jerome MILLER,
Defendant-Appellee.

Nos. 78–2274, 78–1737, 78–1978
and 78–1979.

United States Court of Appeals,
Fifth Circuit.

Dec. 28, 1979.

Rehearing and Rehearing En Banc
Denied Feb. 14, 1980.

---

W. Ray Jahn, Jeremiah Handy, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellant in No. 78–2274.

LeRoy M. Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellant.

Robert Ramos, Asst. Federal Public Defender, Raymond C. Caballero, El Paso, Tex., for defendant-appellee.

Before COLEMAN, Chief Judge, GODBOLD and INGRAHAM, Circuit Judges.

COLEMAN, Chief Judge:

This is a government appeal, 18 U.S.C., § 3731,[1] from the suppression of (1) tangible evidence found in the Miller automobile and (2) Miller's confessions after he had been arrested and arraigned for having a false driver's license and an expired automobile inspection sticker. The District Court first suppressed a pistol, rifle, and a portfolio found in the Miller automobile. Later, it suppressed all use of Miller's correct identity and three confessions which, while voluntary, were thought to be "fruits of the poisonous tree".

## I

### The Indictments

On January 9, 1978, Clifford Miller, a previously convicted felon, was indicted in the Pecos Division of the Western District of Texas for possession of a firearm in violation of 18 U.S.C., § 1202(a) Appendix.[2] On January 19, 1978, Clifford Miller and Kathelyn Miller were jointly indicted in the El Paso Division of the Western District for conspiracy to defraud the United States by filing a false social security claim in violation of 18 U.S.C., § 286.[3] Count two of the same indictment charged Kathelyn Miller with the completed substantive offense, in violation of 18 U.S.C., § 287,[4] and Clifford Miller with aiding and abetting that offense. A third indictment was filed in the El Paso Division on March 2, 1978, charging Clifford Miller and Kathelyn Miller with mail fraud, in violation of 18 U.S.C., § 1341.[5]

1. § 3731. Appeal by United States

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be released in accordance with chapter 207 of this title.

The provisions of this section shall be liberally construed to effectuate its purposes.

2. 18 U.S.C. § 1202(a)(1) Appendix

(a) Persons liable; penalties for violations
Any person who—
(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or
(2) has been discharged from the Armed Forces under dishonorable conditions, or
(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or
(4) having been a citizen of the United States has renounced his citizenship, or
(5) being an alien is illegally or unlawfully in the United States,
and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

3. 18 U.S.C. § 286
§ 286. Conspiracy to defraud the Government with respect to claims
Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

4. 18 U.S.C. § 287
§ 287. False, fictitious or fraudulent claims
Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

5. 18 U.S.C. § 1341
§ 1341. Frauds and swindles
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for

## II

### *The Astonishing Facts*

On November 18, 1977, officers of the Texas Department of Public Safety (DPS) set up a routine license and vehicle registration checkpoint adjacent to a Border Patrol checkpoint, a lighted area, on Highway 67, about five miles south of Marfa, Texas. All cars traveling in either direction were stopped for the purpose of checking driver licenses and motor vehicle registration, a procedure apparently approved in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

Officers at the checkpoint were DPS Officers (Agents) Greer, Kilpatrick, and Maxwell, along with a state highway patrolman, the county sheriff, and several other officers. The checkpoint was set up at noon and operated for twenty-four hours.

Around 8 o'clock p. m., after dark, a 1969 Chrysler, with other cars behind it in the same traffic lane, was stopped in regular traffic. It was driven by an individual who ultimately turned out to be Clifford Jerome Miller. His wife, Mrs. Kathelyn Miller, was also riding on the front seat. The automobile carried Texas license plates and displayed an expired safety inspection sticker.

Miller showed Agent Maxwell a New Mexico temporary driver's permit, made out to Joseph Rosenfeld, specifying a date of birth and social security number. The document was only a carbon copy of the original and it carried no picture. When Agent Maxwell asked Miller to state his name, birthday, and social security number, Miller said his name was "Rosenfeld" and gave the date of birth listed on the permit. However, he recited a completely different social security number to that appearing on the permit.

Maxwell requested that Miller step to the rear of the vehicle, where he was asked to repeat the information recorded on the temporary license, whereupon he gave the same response. This, of course, alerted the officers to the likelihood that there was something rotten in Denmark.

When asked about the ownership of the Chrysler, Miller stated that he had just purchased it in south Texas from Alfred Phipps. Suspiciously enough, he could provide no bill of sale or other document evidencing that transaction. Whereupon, Maxwell called Officer Greer, who was then checking the first car behind Miller's, to run a National Crime Information Center (NCIC) check on the permit and the automobile. While Miller was with Greer, and while the dispatcher was being contacted by radio for the desired reports, Maxwell drove the Miller Chrysler off the pavement, out of the highway traffic lane. He parked it at the end of the Border Patrol van, on the shoulder of the road, so that it would not obstruct moving traffic and halt the ongoing checks of other vehicles. Mrs. Miller remained in the car, sitting where she had been, on the passenger side of the front seat. Upon getting into the car for the purpose of moving it off the road, Maxwell saw a Colt's pistol and holster between the bucket seats, only partially covered with a pillow. He unloaded the pistol and took it to Officer Greer in order that an NCIC check might also be run on it.

When the NCIC reports came in, Greer told Maxwell that the vehicle was reported as registered to Alfred Phipps, of Alice, Texas, and that there was nothing in the computer on the temporary driver's license.

obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

While all this was going on Miller volunteered that he had *"purchased the pistol somewhere up North, and that there was a 30.06 rifle in the back seat that he [Maxwell] could check, also"*.

When Maxwell went back to the car to pick up the rifle he saw a plastic identification holder over the sun visor which, upon examination, contained credit cards issued to an oil company. Without stopping to pick up the rifle, Maxwell took these cards to Greer and then returned for the rifle. When he got back with the rifle he found out that "Rosenfeld" was now claiming to be Phipps. However, "Rosenfeld" gave different "middle names" for Phipps. He said that he had been arrested for DWI in Wyoming, that his driver's license had been taken away from him, that he knew he couldn't get a driver's license using his real name, so he used the name Joseph Rosenfeld to get the New Mexico license. Greer testified that there was a credit card slip with the cards, signed that day with a "Phipps" signature. This signed credit slip was what caused "Rosenfeld" to start claiming that he, in fact, was Phipps. However, the credit card incident is of no materiality to this appeal as Miller has not been indicted on that subject.

In the face of the credit card development, Maxwell went back to the car, where the lady passenger insisted that the driver's name was Rosenfeld, which Maxwell, of course, knew to be untrue.

The NCIC reported that the rifle had been stolen in El Paso and that the credit cards were also stolen. Upon receipt of that information, Greer arrested "Rosenfeld-Phipps" and gave him his *Miranda* warnings.

When Maxwell asked the lady passenger for the second time about the identity of the driver of the car and she insisted that he was Rosenfeld, Maxwell looked in the back seat and saw a plastic portfolio behind the driver's seat which, it turned out, contained several sets of identification and a blue diary. He next searched the trunk of

the vehicle, the back seat, and two footlockers on top of the car. Nothing found in the trunk or in the footlockers seems to have been of any evidentiary importance. The diary, when read by Maxwell later that night, opened a trail which caused the discovery of Miller's true identity. It also led to his identification as the perpetrator of a bizarre insurance fraud.

Although the passenger was not arrested, she went to the jail, but was then taken to the bus station so that she could return home.[6] Meanwhile, Agents Maxwell and Greer examined the blue diary. They then requested that a deputy go to the bus station and get the passenger and return her to the jail where she and the prisoner were questioned about entries in the diary and the driver's identification. Apparently, they learned nothing from her. She was then permitted to return to the bus station.

The next day after his arrest, the driver was duly arraigned, was again warned of his rights, and bond was set.

On the evening of the arrest and the next morning, Maxwell read through the blue diary and other documents taken from the portfolio. He then called the Mutual of New York Insurance Company (MONY) to try to obtain identifying information. By that call he learned that the automobile driver's true identity was *Clifford Jerome Miller*. Maxwell also found out that Mrs. Miller had unsuccessfully sued MONY for $50,000 for life insurance allegedly due for the asserted death of her husband, who at one time had been a MONY employee. He was told that there had been a similar claim against Standard Insurance Company of Oregon. Maxwell confronted "Rosenfeld-Phipps" with this information, meeting first with a denial and then with an admission that the prisoner, in fact, was Clifford J. Miller.

After these conversations, Officer Maxwell called the FBI to advise of the potential mail fraud and social security violations by Miller, and he called an Alcohol, Tobac-

---

**6.** The officers explained that they did not let the passenger leave in the car because at this time they were still unsure as to its correct owner.

co, and Firearms (ATF) Agent to report a possible firearm violation. Meanwhile MONY apparently contacted the Standard Insurance Company and notified them that Miller was not dead, but very much alive. Standard Insurance then contacted the Postal Inspector to request a mail fraud investigation in the case.[7]

On November 22, 1977, Miller was arraigned before a Presidio County Justice of the Peace as a "fugitive from El Dorado County, California, Governor's warrant # 14530". In his right name Miller signed the arraignment form which fully advised him of his right to counsel, that counsel would be appointed for him if he was too poor to afford a lawyer, that he had a right to remain silent, that he was not required to make a statement, and any statement he did make could be used against him in court, that he had a right to stop interviews or questioning at any time and that he had a right to an examining trial.

On November 29,[8] eleven days after his arrest, still in jail because he could not furnish bail, Miller consented to interviews with agents representing three federal agencies. In each and every instance, Miller was warned of his *Miranda* rights and signed the waiver form.

Postal Inspector Harmond Clemmons conducted the first interview at 9:00 a. m. Clemmons, stationed in Texas, had been asked by a postal inspector in Oregon to interview Miller. Clemmons had not heard of the diary and knew nothing of its contents. He had only been given an outline of the insurance transactions and been told that Miller was still alive.

Miller told Clemmons that he had purchased the Standard Insurance policy while living in California, prior to moving to El Paso in 1974, where he worked as an agent

for MONY. He stated that he started putting his "death plan" together in October of 1975 while in Mexico. On December 2nd or 3rd of that year, he and his wife returned to Mexico, and with the help of a doctor, a judge, and another man, Miller faked a heart attack in a field and was pronounced dead. He stated that his wife did not know about his plan. His "funeral" was the next day.

Miller said he returned to the United States via Laredo, Texas, on December 7, 1975, three or four days after the faked death and funeral, using false identification under the assumed name of Alfred Phipps. Before going to Mexico he had arranged for these false identification papers. He said that two or three months later he contacted his wife to tell her that he was alive and that she should go ahead with the insurance claims on his death. He asked her to send him $2,000 of the insurance money she had already received.

About a week prior to November 29, ATF Agent Jimmy Searles had been briefed by Maxwell, but he was mainly concerned with Miller's prior conviction and a description of the guns which were in his possession at the time of his arrest. At 10:30 a. m., November 29, Searles interviewed Miller. *For the fourth time,* Miller was advised of his rights, which he again waived in writing. The statement obtained by Searles dealt *only with the firearms and contained no reference to the insurance matter.*

Wayne Taylor of the FBI was the third federal officer to interview Miller on November 29. Although Agent Taylor had in his possession all the documents seized in the search, he was not completely familiar with their contents, but the major part of the information he got from Miller was

7. MONY had paid nothing to Mrs. Miller; Standard Insurance had paid her $19,129.91.

8. On November 22 appellee Miller had been arraigned before a Texas Justice of the Peace on charges of having a false driver's license and an expired inspection sticker, both Class C misdemeanors under state law. The judge imposed a fine for the traffic violations and was going to read Miller his rights before proceed-

ing with more serious charges when Miller asked to see his lawyer. Miller was allowed to call a lawyer, but the attorney never returned the call. Later that same day Miller was taken before the same Justice of the Peace who was informed that the lawyer had not returned the call. The judge advised Miller of his rights and set his bond.

clearly connected with and based on the contents of the diary.

## III

### The Suppression Rulings

Two suppression hearings were held on the three indictments which had been consolidated for hearing purposes. At the first suppression hearing the District Court made oral findings and rulings. He refused to suppress the statements which Kathelyn Miller made during non-custodial interrogation. He granted the motion to suppress the revolver and rifle and all other tangible evidence recovered from the Miller's vehicle. A written order was entered on March 10, 1978, but the number on the order was only that of the firearms case (the Pecos Division case).

A second suppression hearing was held on April 28, 1978, partially for the purpose of clarifying the first suppression order and to hear further testimony on the issue of the admissibility of Clifford Miller's three confessions. The memorandum opinion and order following this hearing were entered on May 30, 1978.

As to Clifford Miller, the Court then suppressed all items seized from the car and all fruits thereof, including the statements elicited from him by agents subsequent to the search (with the exception of two pages of the FBI report) *and all evidence of his actual identity.* As to Kathelyn Miller, the Court suppressed all items seized during the search of the appellees' vehicle and all fruits of that search except for her husband's confession.[9]

The government filed notices of appeal from each of the orders. The cases have been consolidated for consideration here.

## IV

### The Findings in the District Court

### The First Hearing

We consider it advisable to copy *in toto* the oral findings of the District Court after the first (Pecos) suppression hearing:

THE COURT: The factual situation concerning what lead up to the ultimate arrest of Mr. Miller is, I think, probably a perfect example of good police work that is handled carefully, conscientiously but improperly. There's no question in my mind, . . . that in fact the moving of that automobile led to a chain of events and started a chain of events which sequentially, one to another, left it fairly clear to me that the search was not a proper search.

I don't have any question at all about the propriety to stop, and I don't believe the defendant, Mr. Miller, does. I don't have any question in my mind about the propriety of the asking for the driver's license, nor the suspicion that the officer had when Mr. Miller gave him, on two different occasions, a Social Security number which was not the one listed on the temporary license. If he had said he couldn't remember his Social Security number, I think that would have been understandable. But to have obviously known his Social Security number committed to memory and be able to give it to the officers twice, I think, would make any officer suspicious that something was not quite right. I think the officers quite correctly ran the check of the vehicle, on the registration itself, but it came back negative. I think they quite properly tried to run down his driver's license and any information they could about that. And again, there was nothing that led them any further there.

Then Mr. Maxwell got back in the car, and he got back in without the consent, obviously, of Mr. Miller, and he says that he did. It may have been a ministerial act, and it may have been the most logical and appropriate thing to do, *but it seems to the Court that at that point had he not gotten back in the car, he never would have seen the pistol.* (Emphasis added by the copier).

---

**9.** To say the least, any evidentiary use of Miller's confessions against his wife would be highly problematical, but that remains for another day.

Now, if they had had some fear about that car or about—about the people in the car being a danger to them, I am relatively certain that they would not have left his companion in the car, and they didn't know who she was at the time, didn't know whether she was his wife, girl friend, or what she was. They left her in the car, and it wasn't until fifteen or twenty minutes later they took her out, and for her comfort, allowed her to go to the van.

So they saw the pistol. They brought the pistol back and ran the check on it, and it came back negative. And then Mr. Miller volunteered that, "If you're concerned about that, there's a thirty ought six in the back of the car". And Mr. Maxwell testified that he could reach back in the back and obviously saw it and had no difficulty getting it. But he got back in the car then and started going through other things, namely the thing— the visor, the credit cards and at some point—and it's not clear when—into the portfolio on the back seat that was lying apparently in plain view on the back seat, which, of course, was a rich harvest of things.

I just can't believe that there was at that time any probable cause for that search. Obviously, they were correct. Obviously, they had hold of a man who is involved in questionable activities, but they didn't know that at the time. All they suspicioned was they might have a stolen car, and they found they didn't. They didn't know what it was, but they knew what it wasn't.

The oral findings were delivered on March 6, 1978. On March 10, the Court entered a written order suppressing the .38 caliber revolver, the 30.06 caliber rifle, and all other tangible evidence recovered from defendant's vehicle, "because the Court is of the opinion that the search of defendant's vehicle was conducted without probable cause to believe that an offense had been committed".

Nothing was said as to Miller's volunteering the presence of the rifle or his sugges-tion that the officers could check it if they wished to do so.

### The Second Hearing

A second suppression hearing took place in El Paso on April 28, 1978. This hearing was directed to the various statements given by Miller to various officers who had interviewed him in the jail at Marfa.

The Court then entered another order in which it was held that "[A]fter the NCIC reports on the vehicle, the defendant's driver's permit and the pistol came back as negative, the officers' search became little more than a fishing expedition".

The Court further held that:

"[T]he initial intrusion must be justified before the validity of subsequent police conduct of a warrantless search of an automobile can be considered [citing *Coolidge v. New Hampshire,* 403 U.S. 443 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971)] but here, although the initial stop was justified, the agents went beyond the permissible scope of intrusion."

The Court then ordered that:

"All fruits of the search of the defendant's vehicle, including all items seized therein, are SUPPRESSED" [as to all three indictments against Miller]. The same order was entered as to Miller's wife on the two indictments in which she was charged.

It was further held that:

"[N]one of the government agents who elicited statements from defendant Clifford Jerome Miller could have done so but for Agent Maxwell's seizure of the defendant's diary and his subsequent perusal thereof . . . . The government has shown no attenuation sufficient to destroy the taint which arises out of the illegal search of the defendant's vehicle and continued through each of the interviews with defendant Clifford Jerome Miller except as to the interview with the FBI Agent Taylor. Agent Taylor's testimony clearly reflected that, although he had access to the information contained in the diary prior to interview-

ing the defendant on November 29, 1977, he did not refer to the diary until after the defendant had narrated the events of his past to him."

It was ordered that the government:

"Shall not attempt to introduce any evidence as to his identity against [Miller] in prosecuting him."

This ruling was based on the finding that Miller did not *voluntarily reveal his identity* (emphasis added) and that but for the illegally seized diary and identification cards, Agent Maxwell could not have found whom to contact in order to discover Miller's actual identity.

It was further held, however, that Kathelyn Miller did not have standing to challenge her husband's statements made while he was in custody, or his identification.

### V

### *The Applicable Law*

Since the District Court was of the view that Maxwell's removal of the Miller car to the shoulder of the road was an act which "poisoned" everything that occurred thereafter, the first inquiry is whether entering the Miller car to get it out of the line of traffic "was unreasonable under the circumstances", *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

We believe that this question should be answered in the negative—moving the car was not unreasonable.

We start from the undisputed premise that the officers were performing a lawful state function, on a public highway, in a lawful manner, *State of Delaware v. Prouse, supra.*

10. D. Motion to Suppress

The Texas roadside detention of the car occupied by Kaiser and Fortune resulted in the discovery and seizure of the murder victim's driver's license and two pistols. The pistols had been purchased shortly before the murder and, according to expert testimony, possibly had been employed in the shooting. Appellant moved unsuccessfully to suppress this evidence as obtained in violation of his fourth amendment rights.

Neither Miller nor his wife testified in support of the motion to suppress. There was no proof in support of a notion that the officer drove the Miller automobile out of the line of traffic backed up behind it as a pretext for getting an otherwise prohibited look at things inside the vehicle, *see United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 1062, 55 L.Ed.2d 268 (1978). The absence of such proof is hardly surprising since in the lighted area at the Border Patrol checkpoint it is likely that Maxwell could have seen the pistol by merely looking through the window from the outside. *See United States v. Kaiser,* 5 Cir., 1977, 545 F.2d 467, 476.[10]

Moreover, it is reasonable that the officers may take any action reasonably necessary and relevant to the operation when it is not a pretext for circumventing constitutional rights. The rationale for getting this car off the highway is no different to allowing an inventory of the contents of an automobile lawfully impounded as the result of an arrest. Moreover, it would have been unreasonable, and likely a public safety hazard, to delay all the vehicles behind the Miller car while his status was being resolved.

Finally, the Millers were exercising no expectations of privacy in the pistol. They did not conceal it when they encountered the roadblock and Mrs. Miller took no steps to conceal it while Miller was being questioned about his driver's permit and lack of a vehicle title.

*Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), was a case in which two police officers on routine patrol saw the defendant driving an automobile with an expired license plate. The

Two police officers testified to independent observations of traffic violations prior to stopping the car. The officer who approached the driver's side testified that Fortune handed him, apparently inadvertently, the license that later proved to belong to the murder victim. The other policeman testified that, on approaching the passenger's side, the two distinctive pistol handles were plainly visible in the seat next to Kaiser.

545 F.2d at 476 (per Goldberg, J.)

officers stopped the vehicle for the purpose of issuing a traffic summons. The defendant was asked to step out of the car and produce his owner's card and operator's license. When the defendant stepped out, a large bulge was seen under his sports jacket, which led to the detection of a .38 caliber revolver loaded with five rounds of ammunition. A motion to suppress the revolver was denied and the Supreme Court affirmed. The Court held that the intrusion caused by asking the defendant to step out of the car could "only be described as *de minimis*"; that it hardly rose to the level of a petty indignity. Moreover, the Court held that the mere inconvenience of getting out could not prevail when balanced against legitimate concern for the officers' safety.

■ While no question of officer safety entered the instant case, the efficient operation of a roadblock for lawful purposes, along with a reasonable regard for the travel rights and personal safety of other travelers, was involved. It was perfectly natural for the officer to wish to get the car out of the way. Simply moving a lawfully halted vehicle at a checkpoint to the side of the road, when no search is intended or undertaken, is not an infringement of Fourth Amendment rights.

The pistol was in plain view. Following an unbroken line of authority, we have repeatedly held that where the initial intrusion is not unreasonable, the warrantless seizure of inadvertently-discovered evidence in plain view does not offend the Constitution if it is immediately apparent to the police officer that he has evidence before him. *See, e. g., United States v. Duckett*, 5 Cir., 1978, 583 F.2d 1309.

*Duckett* was a case in which an automobile had been stopped because the motor vehicle did not have a visible license plate light. The motorist was unable to produce an operator's license, a vehicle registration form, or any other means of identification. He was arrested. While looking for the vehicle identification number (VIN) on the vehicle, the officer saw two envelopes addressed to someone other than Duckett. Inside an already opened envelope were two United States Treasury checks made payable to someone other than Duckett. We affirmed a denial of suppression of the government checks.

■ While it was not unlawful for the Millers, as travelers, to have a pistol in their automobile, there was nothing unreasonable about running the NCIC check on it once it had been discovered in plain view. NCIC information on the pistol might well have led to the correct identification of the driver who for two reasons had put his identity in doubt (1) by offering the officers a carbon copy of a temporary driver's permit with no picture on it (a temporary New Mexico permit for the driver of a car carrying a Texas license plate) and (2) by being unable to furnish any documentary evidence that he, in fact, had title to the automobile.

■ Neither the removal of the automobile nor the seizure of the pistol for the purpose of having it checked against National records maintained for that very purpose was a violation of constitutional rights. It necessarily follows that when Miller, contemporaneously with the receipt of the report on the pistol, volunteered the information that the rifle was in the car and suggested that the officers could have it checked if they so desired, accepting that suggestion was neither unreasonable nor arbitrary. Even if it had taken a search to locate the rifle on the backseat, which the officers without contradiction denied, *Miller had suggested the search.*

The officers had not asked Miller if there were other firearms in the automobile. He simply volunteered it. This involved no infringement of *Miranda* rights.

> Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

The fact that NCIC had reported the car as registered to one Phipps did not prove that Phipps had sold or loaned it to "Rosenfeld". Neither did it prove that the man

who got out of the car was Phipps. The NCIC report on the temporary driver's permit offered no information whatever.

In any event, as we appraise the facts, neither the pistol nor the rifle was obtained by what might be considered to be a conventional search. The pistol was in plain view. Miller told the officer where to go get the rifle, negating any necessity for uncovering it by searching for it.

We are compelled to the view that by originally entertaining the idea that moving the car onto the shoulder of the road was itself unlawful and thus unconstitutionally tainted everything which occurred thereafter, the Court fell into the error of suppressing the pistol and the rifle.

We reverse the suppression of the pistol and the rifle and remand the case for trial as to the unlawful possession of these weapons by one previously convicted of a felony.

### The Suppression of any Evidence as to Miller's Identity

■ We have held that the seizure of the pistol and the rifle did not offend the Fourth Amendment. Accordingly, those weapons were admissible in evidence. However, competent proof of Miller's actual identity is a necessary predicate to establishing that he is the same person who previously had been convicted of a felony, an essential ingredient of this federal firearms violation. Did the trial court err when it suppressed *all use* of Miller's actual identity?

We shall hold, *post*, that the seizure of the diary contravened the Fourth Amendment. The diary put the officers on the trail which resulted in the discovery that "Rosenfeld-Phipps" was, in fact, Miller. The District Court was of the opinion that "but for" the use of the tainted diary Miller's true identity would never have been learned, therefore, it directed that the government "shall not attempt to introduce any evidence as to his identity against [Miller] in prosecuting him". It suppressed "all use of Miller's correct identity". This, of course, stopped the prosecution dead in its tracks.

It must be recognized that from the very outset Miller's true identity was in question. He had volunteered the presence of the rifle. The NCIC check was run on it prior to, and independently of, the search of the portfolio. The information from the portfolio was not the exclusive source available to the police. Miller had been arrested. His fingerprints were available. The stolen gun could be traced. An elementary investigation would have settled the existence or non-existence of an Alfred H. Phipps in Alice, Texas. It would have been surprising indeed if a reasonably intelligent investigator could not have found someone who knew Miller on sight. Miller's actual identity might be proved from evidentiary sources having absolutely no connection with the portfolio.

The question then becomes: Where, by unconstitutionally obtained documents, the government learns the identity of a person travelling on the public highway, with a false driver's permit and attempting to evade identification, is the prosecution thereby foreclosed from producing identity from independent, untainted sources?

■ Miller's identity was not dependent on a search and seizure in the usual Fourth Amendment sense. His person was in plain view in a pubic place, voluntarily exposed to the sight of all who wished to see. For the observation of his generally identifying characteristics no search was *necessary*. What a person knowingly exposes to the public, even in his own home or office, to say nothing of the public highway, is not the subject of Fourth Amendment protection, *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).

■ Miller's identity was an immutable fact, the same before and after the public encounter. Nothing discovered there or afterwards could alter it. The officers could not seize it like seizing a physical object.

Miller was lawfully in custody and it only remained for the officers to learn his identity by constitutionally admissible means.

See *United States v. Houltin*, 5 Cir., 1978, 566 F.2d 1027.

This situation is governed by what Mr. Justice Holmes wrote in *Silverthorne Lumber Company v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920):

> Of course this does not mean that the facts thus [unconstitutionally] obtained became sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . . . .

This holding was quoted in *Nardone v. United States*,[11] in *Wong Sun v. United States*,[12] and again in *United States v. Ceccolini*.[13]

We hold that Miller's actual identity may be proved by evidence, if there be any, from sources unconnected with the search of the portfolio and the examination of its contents. To the extent that the order suppressed "any" and "all" evidence of identity, as hereinabove set forth, it will be reversed and the case remanded to the District Court.

■ We agree, of course, that under the "fruit of the poisonous tree" doctrine none of those involved in the seizure and utilization of the diary itself may be allowed to testify as to Miller's true identity, although they are certainly free to testify as to the details of the arrest and to identify him in court as the person arrested.

#### The Firearms Confessions

■ Miller was lawfully arrested for the possession of the stolen rifle. The statements made to Searles and Greer with reference to the firearms came after Miller had been thoroughly informed of his rights to silence and counsel. Indeed, he specifically declined to give Searles any more information "without my attorney being

present".[14] These statements were obviously voluntary in every respect. The statement to Searles recites Miller's record of convictions, where and how he obtained the weapons, and how he come to have them with him when stopped near Marfa. Not a word is said of the insurance matters uncovered by the use of the diaries. The statement to Greer confirmed only the story given to Searles as to where he, Miller, had obtained the rifle.

The statements to Searles and Greer should not have been suppressed in their entirety. Only those parts of the confessions in which Miller correctly identified himself as "Clifford Jerome Miller" should be excised. Therefore, except for the identification of Miller, the suppression of the statements given Officers Searles and Greer in connection with the firearms is reversed.

#### The Search of the Portfolio and the Subsequent Confessions with Reference to the Insurance Frauds

■ Assuming that the portfolio was Miller's personal luggage, an assumption which appears to be supported by the evidence, we agree with the defendants that the search of that portfolio did not comply with Fourth Amendment requirements, *Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Johnson*, 5 Cir., 1979, 588 F.2d 147, 151. The government's argument that the admissibility of the portfolio contents may be rescued as an "inventory search" simply is not supported by the record. The diary may not be introduced in evidence against Miller.

■ Miller contends that his subsequent confessions with reference to the insurance frauds were "fruits of the poisonous tree" and that they were correctly suppressed.

11. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939).

12. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

13. *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978).

14. Miller's exact statement, signed by him, recites: "I do not wish to say anything more without my attorney being present", and the statement stops at that point.

Here, following a wealth of precedent, we must, at least in part, agree with Miller. Prior to the search of the portfolio none of the officers so much as suspected Miller of the insurance fraud. They were not looking for insurance fraud. The seizure of the diary did not comply with Fourth Amendment requirements. Its contents set in motion the desire of the subsequently investigating officers to obtain statements from him. Postal Inspector Clemmons did not see the diary and did not know of its existence; he, however, had been informed of facts which had been gathered from the diary. It necessarily follows that his use of that information was to exploit it. We cannot say that his lack of knowledge as to the existence of the diary and his failure to have seen it supplied an attenuation sufficient to purge the primary taint. To hold otherwise would open a potentially large loophole for the use of illegally obtained evidence; in other words, "turn the information over to a fellow officer without informing him where it came from". Obviously, this approach could not pass constitutional muster.

This leaves one final question—was the Clemmons confession "an intervening act of free will that purges the evidence of the taint of the unlawful invasion"?

The Clemmons confession will be annexed to this opinion as an Appendix.

Its opening paragraph states that

Prior to being interviewed, Mr. Miller was advised that I wanted to talk with him about his faked death, the fake death certificate, and the claims filed against his insurance. He was advised of his rights, and he said he had no objections to talking, but he would possibly not answer some questions.

Miller signed the waiver form which will also be appended to this opinion.

At the close of the Clemmons statement, it is recited that "Miller refused to furnish handwriting exemplars".

Before Miller signed the Clemmons waiver, he had been informed of his right to remain silent and his right to counsel when he had been arraigned on a fugitive warrant from California, on November 22. Twice that same day, November 29, Miller had been informed of his rights and had signed waivers before being interviewed by other officers. There can be no doubt that the statement to Inspector Clemmons was voluntarily given, with full knowledge of and waiver of constitutional rights.

 In order for the causal chain between the illegal acquisition of the Miller diary and his subsequent statements to be broken, the statements must have been voluntary and "sufficiently an act of the free will to purge the primary taint", *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

*Brown* further teaches that the burden of admissibility rests with the prosecution, that *Miranda* warnings are an important factor but standing alone they cannot always make the act sufficiently a product of the free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. Alternatively, *per se* or "but for" rules are rejected.

 The issue must be answered on the facts of each case. However, the record may be of amply sufficient detail and depth to allow an answer at the appellate level. Factors to be considered, in addition to warnings, are the temporal proximity of the illegality and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.[15]

**15.** On this subject, in *United States v. Wilson,* 5 Cir., 1978, 569 F.2d 392, we spoke as follows:
The critical question is whether the consent or other action was such an intervening act of free will that it purges the evidence of the taint of the unlawful invasion. Courts must not only examine the voluntariness of

the confession but whether the statement or other action was a sufficient act of free will to eliminate the taint of the illegal arrest, *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Moffett v. Wainwright,* 5 Cir., 1975, 512 F.2d 496, 502; see *Thomas v. United States, supra,* 5 Cir.,

The District Court held that none of the government agents who elicited statements from Miller could have done so *but for* (emphasis added) Agent Maxwell's seizure of the defendant's diary and his subsequent perusal thereof, that the government had shown no attenuation sufficient to destroy the taint which arose from the illegal search of the defendant's vehicle and continued through each of the interviews with Miller, except for part of the interview had with FBI Agent Taylor.

 As *Brown* teaches, however, cases of this type are not to be decided on a *per se* "but for" rationale. See, also, *Parker v. Estelle,* 5 Cir., 1974, 498 F.2d 625, 629. Other factors are to be considered.

We consider the following factors:

1. Miller had been *lawfully,* not unlawfully, arrested.

2. His right to counsel and right to remain silent had been explained to him when he was arrested on November 18. This was done again before the Magistrate on November 22. This was repeated by Postal Inspector Clemmons and by two other officers on November 29.

3. At least eight days had elapsed between the discovery of the diary and Clemmons' visit.

4. Miller told Clemmons that he was willing to talk on some subjects but might not be willing to talk about others, indicating that he knew he had his choices, was free to exercise them, and he, as a matter of fact, did exercise them.

5. That same day he had declined to talk further with Officer Searles about the firearms violation until his lawyer was present.

6. Miller refused to supply Clemmons with handwriting exemplars.

7. It has been argued that the discovery of the diary let Miller know that the game was up and for this reason he was under compulsion to talk. No one testified to that. We are under no duty to speculate about it, *Parker v. Estelle, supra,* 498 F.2d at 630.

8. The significance of the nexus between an illegal search and challenged evidence is one of common sense, . . . to be considered under the facts and circumstances of the particular case, *United States v. Houltin, supra,* at 1031.

 Under the facts and circumstances of this case, applying the law as herein discussed, we hold that the Fourth Amendment does not bar the admissibility of Miller's statement to Postal Inspector Clemmons. The record establishes that Miller's statement to Clemmons was an intervening act of free will which purged any taint accruing from the original seizure and perusal of the diary.

---

377 F.2d 118, at 120; *Rogers v. United States, supra,* 5 Cir., 330 F.2d 535, at 541.

There are well established guidelines to aid in determining whether the connection between the illegal arrest and the confession or search has become so attenuated as to dissipate the taint and ensure the admissibility of the evidence. Among the factors to be considered are (1) the temporal proximity of the arrest to the procurement of the evidence; (2) the presence of intervening circumstances between the arrest and the discovery of the evidence, *e. g.,* giving of *Miranda* warnings, guidance of an attorney; (3) circumstances surrounding the arrest, *e. g.,* intensive questioning, continuous interrogation, coercion and other official misconduct; *Brown v. Illinois, supra,* 422 U.S. at 603–04, 95 S.Ct. 2254; *United States v. Owen, supra,* 5 Cir., 492 F.2d 1100, at 1107; *Phelper v. Decker, supra,* 5 Cir., 401 F.2d 232, at 237–238; see

*Moffett v. Wainwright, supra,* 512 F.2d at 502–503. Of course, the voluntariness of the consent or confession is a threshold requirement, *Brown v. Illinois, supra,* 422 U.S. at 604, 95 S.Ct. 2254.

The absence or presence of one of these factors is not a *per se* indication of free will sufficient to break the causal connection between the illegality of the arrest and the evidence sought to be suppressed. *E. g., Brown v. Illinois, supra* (giving of *Miranda* warning does not warrant a *per se* finding of free will sufficient to purge evidence of its stigma).

Nor will one factor automatically bar a finding of sufficient free will. *E. g., United States v. Cox,* 5 Cir., 1972, 459 F.2d 986 (taint of illegal arrest was sufficiently dissipated although evidence was obtained within one hour of arrest).

*The Suppression of the Diary as to
Mrs. Miller*

The District Court suppressed the use of the diary against Mrs. Miller. We vacate that order and remand the point to the District Court for further hearing and determination in the light of *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

*Conclusion*

This case is remanded to the District Court for further proceedings not inconsistent herewith.

REMANDED.

APPENDIX

Memorandum of Interview between CLIFFORD JEROME MILLER and Postal Inspector H. B. CLEMMONS
PLACE: Sheriff's Office, Marfa, Texas
DATE: November 29, 1977

Prior to being interviewed, Mr. Miller was advised that I wanted to talk with him about his faked death, the fake death certificate, and the claims filed against his insurance. He was also advised of his rights, and he said he had no objections to talking, but he would possibly not answer some questions.

Miller advised that prior to coming to El Paso, Texas, he had been a radio announcer in Placerville, California. He stated he purchased an insurance policy from Standard Insurance Company of Portland, Oregon, in 1968 from a friend, Jerry Hanses, Placerville, California. He advised he left Placerville, California in late 1973 or early 1974 and went to Torreon, Mexico, where he was to work for a newspaper. The Mexican government, however, would not let him work there. He stated he came back to the states and moved to El Paso in July or August of 1974. He was an insurance agent for Mutual of New York. Miller stated he bought an insurance policy from Mutual of New York during the time he was a salesman with them; however, he denied he bought it strictly for the purpose of defrauding the company.

Miller stated he started putting his death plan together in about October of 1975. He stated at about that time on a visit to Catedral, Chihuahua, Mexico, he talked with a man about faking his death and acquiring a fake death certificate. Miller could not or would not furnish the name of the man he talked to in Mexico. He said on about December 2 or 3, 1975, he and wife Katherine rode the bus to Catedral, Chihuahua, Mexico. The next day he and his wife were taken to a ranch area on the pretext of him looking at some cattle he intended to buy. He left his wife in the car and he and the man from whom he was to buy the cattle walked out into the field for a closer look at the cattle. Miller stated after he and the other man walked out in the field, he faked a heart attack. At about the same time, the two men who were supposedly a doctor and a judge arrived on the scene and took charge of the situation. He said they had been waiting down the road for him to fake his death. He further stated the doctor supposedly gave Mrs. Miller some shots so that she would not be fully aware of what was going on. He stated on the following day a burial was faked in a common grave. In Mexico it is the law that a body must be buried within 24 hours if there is no available refrigeration. He stated so far as he knows, Mrs. Miller returned to El Paso on the bus after the fake burial.

Miller stated he came back to the United States on December 7, 1975, and came through the port of entry at Laredo, Texas under the name of A. H. Phipps. He stated he already had an identification in that name. He stated from Laredo, he went to various towns in Louisiana and eastern Texas working mostly in oil fields. He stated he did not see his wife from the time he left her in Mexico on December 3, 1975, until he met her in Alamogordo, New Mexico on about the 15th or 16th of November 1977. He stated he came through El Paso and called his wife and told her he was in El Paso. He bought a bus ticket which he left at

the bus station in the name of Maria Beltran. He said he told his wife she was to pick up the ticket and ride the bus to Alamogordo and meet him at the bus station there. He said he met her at the bus station and then they proceeded through Hermit, Pecos, Marathon and later into Marfa, Texas where they were picked up at a road block on the night of November 18, 1977. He stated at the time he was using the name Joseph William Rosenfeld and had a temporary New Mexico driver's license in that name. Miller was asked whether or not he had contacted his wife during the time between December 3, 1975, and the time he picked her up at Alamogordo. Miller advised that so far as his wife was concerned, she felt he was dead when she left Catedral, Mexico. He said approximately two or three months later, he did not recall how long, he called her during the middle of the night and told her that he was still alive but that she could go ahead with filing the insurance forms because that was the natural thing to do. He indicated if there had been any way not to claim the insurance money and still make his death look legitimate, he would have done so. However, he would not discuss his reasons as to why he wanted to go on record as being dead. He said he also told his wife she had two choices. One was that she could go ahead and file the insurance claims or he would appear sometime during the night and pick up the children and take them back to Mexico. He also stated he tried on numerous occasions since that date to get his wife to go back to Mexico with him, however, she would not. He said during the meantime he had secured a Mexican birth certificate.

Mr. Miller was asked about the claims submitted to the insurance company and he said he didn't know anything about them, who filled them out or anything. Mr. Miller was then asked if he had shared in any of the proceeds of the insurance payment. He said when he talked to his wife the first time, he asked her if she had received the insurance check. She told him she had. He said he then requested her to send him $2,000 to Oklahoma City, Oklahoma, via air express in the name of Phipps or Askew. He said he used the money to buy a toupee and a Pontiac Firebird automobile.

Miller said he was first convicted of a felony in Sacramento, California in 1961 for forgery. He was also convicted for armed robbery at age 16. He said except for the above, he had no other felony convictions, but numerous convictions for misdemeanors.

Miller refused to furnish handwriting exemplars.

## UNITED STATES POSTAL INSPECTION SERVICE WARNING AND WAIVER OF RIGHTS

Place: Sheriffs Office
 Marfa, Tex.
Date: 11–29–77 Time: 0910

### WARNING

BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

* You have a right to remain silent.
* Anything you say can be used against you in court.
* You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
* If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
* If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

### WAIVER

I have read this statement (This statement of my rights has been read to me) and I understand what my rights are. I am willing to discuss subjects presented

and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

s/ Clifford J. Miller

(Signature)

 0910 AM 11–29–77

(Time) (Date)

Witnessed by: s/ H. B. Clemmons

Title: Postal Inspector

Witnessed by:

Title: