### UNITED STATES of America

v.

### Cesar RAMOS.

### Crim. No. L–89–447.

United States District Court,
S.D. Texas,
Laredo Division.

Dec. 18, 1989.

---

Dick Deguerin, Houston, Tex., for defendant.

Raul Casso, IV, for U.S.

## MEMORANDUM OPINION

KAZEN, District Judge.

Pending is Defendant's motion to suppress. At issue is the legality of the initial stop of Defendant's automobile on a Texas highway. The vehicle was stopped by Martin Cuellar, Jr., a Texas Department of Public Safety Officer assigned to the Narcotics Division. The stop occurred on FM 649, approximately ¼ mile north of its junction with Texas Highway 16 in Jim Hogg County. The stop occurred between 5:00 p.m. and 6:00 p.m. during what Cuellar described as "a routine driver's license safety checkpoint." (TR. 20). The "primary purpose" of the checkpoint was "to check driver's license (sic), check registrations, and other minor regulatory traffic laws." (TR. 20).

Cuellar was not assisted by any other law enforcement officer, although he was accompanied by a personal friend in civilian clothing. The location of this checkpoint was selected for "no specific reason." (TR. 20). There were no flashing lights, signs, traffic cones, or anything else to warn oncoming traffic of the roadblock. Instead Officer Cuellar simply parked his vehicle on the side of the road, perpendicular to the highway. He then stood in the middle of the road and stopped traffic by hand. It was his intent to stop every vehicle travelling north. According to Cuellar, because he felt free to check at least drivers' licenses, insurance papers, registration papers, inspection stickers, and automobile equipment, he felt unconstrained by any time limit in detaining any particular automobile. In fact the first vehicle which approached the roadblock was detained for at least 30 minutes. Based on his description of that stop, Cuellar also felt free to question the occupants on such things as their place of origin, destination, and purpose for travel. Cuellar patrols a seven-county area and establishes his one-man checkpoints "randomly," at whatever time and location he chooses and for whatever duration he chooses. He apparently neither seeks nor obtains approval of anyone in this regard. He acknowledged that, in essence, he conducts "sort of a roving temporary checkpoint." (TR. 85).

A threshold issue is whether the legality of this checkpoint is to be determined by state or federal law. Defendant urges that state law applies, citing *United States v. Garcia*, 676 F.2d 1086, 1089 (5th Cir.), rehearing denied, 695 F.2d 806 (5th Cir.1982).[1] In holding that the legality of an arrest for a federal crime by state officers is determined by state law, *Garcia* relied on *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948) and other Fifth Circuit cases citing *Di Re*. As indicated in *United States v. Mahoney*, 712 F.2d 956, 959 n. 3 (5th Cir.1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984), the continued vitality of *Di Re* became highly questionable after the

1. The precedential value of *Garcia* is doubtful in view of the vacation of judgment by the Supreme Court, 462 U.S. 1127, 103 S.Ct. 3105, 77 L.Ed.2d 1360 (1983), and remand to district court by the Fifth Circuit, 719 F.2d 108 (1983).

decision in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Whatever question remained after *Elkins* was surely resolved in *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), where the court stated:

"The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers."

376 U.S. at 366, 84 S.Ct. at 883.

This language was cited by approval by the Fifth Circuit in *United States v. Staller*, 616 F.2d 1284, 1289 n. 7 (5th Cir.1980), *cert. denied*, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980). The Court concludes that federal law governs this issue.

Were Texas law applicable, resolution of this issue would be much simpler. The stop would clearly be considered unlawful. *See Higbie v. State*, 780 S.W.2d 228 (Tex. Crim.App.1989); *Webb v. State*, 739 S.W.2d 802 (Tex.Crim.App.1987); *Meeks v. State*, 692 S.W.2d 504 (Tex.Crim.App.1985); *King v. State*, 733 S.W.2d 704 (Tex.App.—Dallas 1987); *Koonce v. State*, 651 S.W.2d 46 (Tex.App.—Dallas 1983). It would seem anomalous that conduct by a state officer which would be disapproved by a state court might be approved by a federal court. Nevertheless since two distinct sovereigns are involved, and faithful to the teaching of *Preston, supra,* the Court will endeavor to analyze this issue under federal law, which is not so clear on this issue.

█ The seminal case, relied upon by the Government, is *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The actual holding of *Prouse* is that, absent articulable and reasonable suspicion that a violation is occurring, the Fourth Amendment prohibits the stopping of an automobile in order to check its registration and the driver's license. Following the holding, however, is this dicta at the conclusion of the opinion:

"This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative."

440 U.S. at 663, 99 S.Ct. at 1401.

According to *Prouse*, therefore, Officer Cuellar could not stop vehicles at random, without articulable suspicion, to check for drivers' licenses, vehicle registration, etc. Does the quoted dicta in *Prouse* allow him to accomplish the same result by establishing his one-man, roving checkpoints? The only post-*Prouse* Fifth Circuit opinion called to the attention of this Court is *United States v. Miller*, 608 F.2d 1089 (5th Cir.1979), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980). The circumstances of the checkpoint in that case are sparsely described. Apparently DPS officers established "a routine license and vehicle registration checkpoint adjacent to a Border Patrol checkpoint, a lighted area, on Highway 67, about five miles south of Marfa, Texas. All cars traveling in either direction were stopped for the purpose of checking driver licenses and motor vehicle registration ... The checkpoint was set up at noon and operated for twenty-four hours." 608 F.2d at 1093. The checkpoint was manned by three named DPS officers, a state highway patrolman, the county sheriff, "and several other officers." *Id.* With little discussion, the Fifth Circuit indicated that this was "a procedure apparently approved in *Delaware v. Prouse* (citation)." *Id.* The so-called checkpoint established by Officer Cuellar in this case obviously differs significantly from the *Miller* checkpoint.

The checkpoint dicta in *Prouse* came at the conclusion of an opinion in which Justice White discussed two prior Supreme Court decisions dealing with stops by United States Border Patrol officers: *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (roving patrol) and *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (checkpoint). Of these two decisions, Justice White stated:

"Although not dispositive, these decisions undoubtedly provide guidance in balancing the public interest against the individual's Fourth Amendment interests implicated by the practice of spot checks such as occurred in this case."

440 U.S. at 656–57, 99 S.Ct. at 1397–98. It is instructive, therefore, to consider the reasoning behind the *Martinez–Fuerte* opinion. There, the checkpoint was announced one mile ahead by a large black-on-yellow sign with flashing yellow lights, followed by similar signs as the motorist drew nearer. Orange traffic cones funneled traffic into lanes where Border Patrol agents in full dress uniform stood behind a large stop sign. A permanent building was located at the site. Flood lights were present for nighttime operation. 428 U.S. at 546, 96 S.Ct. at 3077–78. The location of the checkpoint was chosen "on the basis of a number of (specified) factors." 428 U.S. at 553, 96 S.Ct. at 3081. The court concluded that the intrusion on public privacy was minimal under these circumstances. Justice Powell wrote:

"Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class."

428 U.S. at 559, 96 S.Ct. at 3083. While a checkpoint need not necessarily have all the attributes described in *Martinez–Fuerte* to pass muster, certainly the language quoted above was contemplated by the Supreme Court when its terse *Prouse* dicta suggested that a roadblock involves "less intrusion" to motorists and does not involve "the unconstrained exercise of discretion." *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401. This same notion was repeated by the Supreme Court in *Brown v. Texas*, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Citing both *Prouse* and *Martinez–Fuerte*, the *Brown* court stated:

"To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or *that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.*"

443 U.S. at 51, 99 S.Ct. at 2640–41 (emphasis added).

It is undisputed that no such plan was involved in Officer Cuellar's operations. It is difficult to imagine a case of more "unconstrained exercise of discretion" than this one. As Cuellar candidly admitted, he established these so-called "checkpoints" whenever and wherever he wanted, for whatever length of time. Working alone, he checked whatever violations he desired and felt no time constraints on the detention of any particular motorist. He is a narcotics officer purporting to check drivers' licenses on an obscure Farm-to-Market Road in South Texas. In this instance, during the hours of 5:00 p.m. to 6:00 p.m., for well over 30 minutes only two vehicles approached this location from the south. The "gravity of the public concerns" served by this checkpoint and "the degree to which (the checkpoint) advances the public interest" is difficult to fathom. *Brown*, 443 U.S. at 51, 99 S.Ct. at 2640.

The Court is convinced that this particular checkpoint cannot possibly be a "roadblock" contemplated by the *Prouse* dicta. It does not pass Fourth Amendment scrutiny. The motion to suppress is GRANTED.