**IN THE UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 94-10117
_____

UNITED STATES OF AMERICA,

Petitioner-Appellee,

versus

PATRICK WILSON,

Respondent-Appellee.

_____

Appeal from United States District Court
for the Northern District of Texas

_____

(October 21, 1994)

Before REAVLEY, DeMOSS and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Patrick Wilson was indicted for possession of stolen mail, to-wit: a personal check which had been mailed to Brant or Tricia Whetstone in a letter or parcel, in violation of 18 U.S.C. § 1708 and 2. Wilson filed a motion to suppress the checkbook and to suppress the statement which he made at the postal inspection office. The district court overruled the motion to suppress. Wilson entered a conditional plea of guilty to possession of a check stolen from the mail, but reserved his right to appeal the adverse ruling on his motion to suppress. Wilson was sentenced to ten months imprisonment, to be followed by three years of supervised release. He appeals the district court's denial of his motion to suppress evidence and a statement. We reverse.

<u>HEARING ON THE MOTION TO SUPPRESS</u>

At the hearing on the motion to suppress, the parties adduced the following evidence:

David McDermott, a U. S. Postal Inspector, was contacted by a confidential informant who reported that Wilson was in room 129 in a hotel in Arlington, Texas. Based on conversations with other individuals, Inspector McDermott believed that there was a good chance that Wilson was involved in the possession of stolen United States mail. Inspector McDermott called Sergeant Robert Cowcert, an officer with the Arlington Police Department, and asked Sgt. Cowcert to accompany him to the hotel room to check for a possibly wanted person. The hotel was frequented by drug users and Inspector McDermott would not have gone alone to the area. Inspector McDermott had previously arrested Wilson and at that time Wilson had been armed.

On or about March 30, 1993 or April 2, 1993, Inspector McDermott and Sgt. Cowcert went to the hotel and determined that room 129 was registered to James Stiles. The officers knocked on the door of the room and, without hesitation, Stiles invited them into the room. When they first entered the room, Stiles' girlfriend was in the room and Wilson was in the bathroom. Inspector McDermott introduced himself to Stiles. At that time, the inspector did not have probable cause to arrest Wilson.

James Stiles had resided in the hotel room for three years. Wilson had slept in Stiles' hotel room the previous night with Stiles' permission. Stiles told the officers that Wilson was in the bathroom and Wilson came out of the bathroom after the officer told him to do so. Sgt. Cowcert made a "protective sweep" of the hotel room, including the bathroom, to insure that there was no one else in the room and no weapons. Sgt. Cowcert stepped into the darkened bathroom with his flashlight on and observed a checkbook in a small trash can. The checkbook was in a colored checkbook cover. The officers then asked Wilson about the checks which were discovered in the bathroom. Wilson and the other two occupants of the room denied any knowledge of the checkbook.

Sgt. Cowcert returned to his car to check the computer for Wilson's name, but found no warrant outstanding for Wilson's arrest. After the checks were discovered, the officers asked Stiles' permission to do a complete search of the room. Stiles gave his written consent to search the room because he had nothing in there to hide.

Inspector McDermott called the person whose name was on the checks and found out that she had been expecting the checks in the mail. Inspector McDermott then requested that Wilson provide him with samples of his handwriting. Wilson agreed to do so and began writing. However, when Inspector McDermott looked at the writing and told Wilson that it appeared that Wilson had written the checks, Wilson refused to return the writing. Inspector McDermott forcefully told Wilson that he could not keep the writing

because it was government property, and Wilson ultimately gave the writing to the inspector.

Inspector McDermott indicated to Wilson that he had obtained sufficient evidence to have Wilson jailed and told Wilson that he would call the police or the U.S. Attorney's office about Wilson, or Wilson could accompany him to the postal inspection office. Wilson decided to accompany Inspector McDermott and followed him to the office. According to Inspector McDermott, Wilson was not under arrest at that time and was free to proceed in another direction.

At the postal inspection office, Wilson and Inspector McDermott were "buzzed" into the office. Wilson believed that he was in custody at that time. Inspector McDermott advised Wilson of his Miranda[1] rights. Wilson waived these rights, gave an oral and written confession to having possession of the stolen mail, and provided a handwriting exemplar. He was photographed and finger printed at the end of the meeting and was then told that he was free to leave the office.

According to Inspector McDermott, Wilson was free to leave the postal inspection office at any time. However, according to Wilson, Inspector McDermott had said that if he did not come to the postal inspection office, the police would arrest him to obtain the exemplar and would hold him for two days; Wilson did not believe that he was free to go after that discussion. Inspector

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 16 L. Ed 2nd 694 (1966).

4

McDermott did not recall what he had said to Wilson about the choice between calling the police and going to the postal inspection office.

Wilson testified that the checks were his and/or he had a possessory interest in the checks. At the conclusion of the hearing, the district court found that Wilson had no standing to contest the search because he had no expectation of privacy in Stiles' hotel apartment. The district court also determined that Sgt. Cowcert went into the bathroom and, by using the flashlight, saw something in the trash can; upon closer inspection, Sgt. Cowcert found that it was the checks. The district court determined that, because Stiles subsequently consented to the search, it was clear that the checkbook would ultimately have been discovered. The district court concluded that the seizure was justified because (1) Wilson has no standing to complain and (2) the checkbook was in plain view. With regard to Wilson's confession, the district court determined that Wilson voluntarily followed Inspector McDermott to the postal inspection office and that he voluntarily gave the challenged statement.

Wilson pled guilty to possession of stolen mail, but reserved his right to appeal the ruling on the motion to suppress. The district court sentenced Wilson to ten months of imprisonment followed by three years of supervised release. Wilson appeals the denial of his motion to suppress asserting, inter alia, that he does have standing to challenge the search and seizure of the checks, that the warrantless seizure was unreasonable and therefore

prohibited by the Fourth Amendment, and that his confession was tainted by the illegal seizure. Because we agree with these contentions, we do not reach either his remaining arguments or the government's response thereto.

DISCUSSION

I. Standing

The government asserts, and the district court found, that Wilson has no standing to contest the search or seizure of the checkbook because he had no expectation of privacy in Stiles' hotel apartment.

Wilson has the burden of showing that he has standing. Once the defendant produces evidence that the search and seizure were warrantless, the burden shifts to the government to justify the warrantless search and seizure. United States v. De La Fuente, 548 F.2d 528, 533 (5th Cir.), cert. denied sub non, Stewart v. US, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977).

In general, a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978), citing Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). In order to have Fourth Amendment standing, a defendant must show 1) an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and 2) that the expectation is one that society

6

would recognize as reasonable. <u>United States v. Doe</u>, 801 F.Supp. 1562, 1572 (E.D. Tex. 1992), citing <u>United States v. Lee</u>, 898 F.2d 1034, 1037-1038 (5th Cir. 1990).

Wilson asserts that, under <u>Minnesota v. Olson</u>, 495 U.S. 91, 110 S.Ct. 1684, __ L.Ed.2d ____ (1990), he has standing. We agree. Although the facts in <u>Olson</u> are dissimilar,[2] its language is broad: <u>Olson</u> states that ". . . status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." <u>Olson</u>, 405 U.S. at 96-97, 110 S.Ct. at 1688. In the instant case, Stiles lived in a hotel room and had lived there for approximately three years. Wilson was an overnight guest in Stiles' "home". Thus, Wilson had an <u>Olson</u> expectation of privacy and he may challenge the district court's ruling on his motion to suppress. Accordingly, we find that the district court erred in its determination that Wilson had no expectation of privacy in Stiles' hotel-residence. Due to his <u>Olson</u> expectation of privacy, Wilson has discharged his burden to show that he has standing to challenge the search and seizure of the checkbook. The burden thus shifts to the government to justify the warrantless search and seizure of the checkbook.

Relying on <u>United States v. Alvarez</u>, 6 F.3d 287, 289 (5th Cir. 1993), <u>cert. denied</u>, 114 S.Ct. 1384, 128 L.Ed.2d 59 (1994), the Government argues that Wilson has no standing because he

_____

[2] "<u>Olson</u> dealt with a warrantless arrest of a person, not the seizure of an object which the suspect had denied owning." <u>Alvarez</u>, 6 F.3d 287, 290, <u>cert. denied</u>, ___ U.S.___, 114 S.Ct.1384, 128 L.Ed.2d 59 (1994).

7

abandoned the checks. In <u>Alvarez</u>, the officers saw Alvarez in the door of his hotel room, approached him with a valid arrest warrant, and lawfully arrested him. By contrast, the instant law enforcement officers had no warrant and no probable cause to arrest Wilson. 6 F.3d at 290. The officers arrested Alvarez and he then voluntarily abandoned any interest in a garment bag that was hanging in the hotel room closet. <u>Id.</u> at 289. The police discovered a pistol in the bag. <u>Id.</u> Alvarez continued to deny an interest in the bag throughout the proceedings and testified that it belonged to his girlfriend. The Court noted that the voluntary abandonment of the bag was "not influenced by any improper police conduct." <u>Id.</u>

We distinguish <u>Alvarez</u> because Sgt. Cowcert seized the instant checkbook prior to Wilson's initial denial of interest in the checks. Shortly after his initial denial, Wilson confessed at the postal inspection office and admitted he had possessed the checkbook. At the motion to suppress, Wilson testified that he had a possessory interest in the checks. The government has cited, and we have found, no authority which states that under these circumstances the presence of the checkbook in a trash can <u>inside</u> Stiles' residence constitutes abandonment.

II. Suppression of the Checkbook

Because the district court found that Wilson had no standing to challenge the search and seizure of the checks, it did not squarely address the question of whether the government carried its burden to justify the warrantless seizure of the checks.

8

However, the district court did find that the checks were in plain view, that Stiles voluntarily consented to the search, and that due to Stiles' subsequent written consent the checks ultimately would have been discovered.

*Standard of Review*

A district court's ruling on a motion to suppress based upon live testimony at a suppression hearing is accepted unless clearly erroneous or influenced by an incorrect view of the law. United States v. Foy, 28 F.3d 464, 474 (5th Cir. 1994); United States v. Laury, 985 F.2d 1293, 1314 (5th Cir. 1993). Furthermore, the evidence must be viewed in the light most favorable to the party that prevailed below. Laury, id. (citations omitted). Questions of law are reviewed de novo, United States v. Muniz-Melchor, 894 F.2d 1430, 1433-34 (5th Cir.), cert. denied, 495 U.S. 923, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990) (quoting United States v. Maldonado, 735 F.2d 809, 814 (5th Cir. 1984), as are the district court's ultimate conclusions of Fourth Amendment reasonableness. United States v. Colin, 928 F.2d 676, 678 (5th Cir. 1991).

*Inevitable Discovery Due to Stiles' Consent?*

The district court determined that the seizure of the check was lawful because Stiles subsequently gave his consent to search the premises and the checkbook would have been ultimately discovered. This finding raises two questions: (1) whether the seizure was justified by Stiles' consent and (2) whether the

9

"inevitable discovery" doctrine would have rendered the seized checks admissible.

Warrantless searches and seizures inside someone's home are presumptively unreasonable unless the occupants consent or exigent circumstances exist to justify the intrusion. United States v. Richard, 994 F.2d 244, 247 (5th Cir. 1993). The instant facts present no exigent circumstances. Accordingly, we examine whether the district court erred in finding that Stiles' consent justified the warrantless search. The standard of review is whether the district court's determination is clearly erroneous. United States v. Ponce, 8 F.3d 989, 997 (5th Cir. 1993).

One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 83 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (19 *); see also, Richard, 994 F.2d at 250. Police may rely on the voluntary consent of a person holding common authority over the place to be searched. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The government must prove by a preponderance of the evidence that the consent was voluntary and, if it is preceded by a Fourth Amendment violation, the burden of proof is heavier. Id. When the justification for a search is based on consent, the government has the burden of proving that the search was conducted within the scope of the consent received. United States v. Ibarra, 965 F.2d 1354, n.2 at 1356 (5th Cir. 1992) (en banc) (equally divided court).

10

In order for the "inevitable discovery" rule to apply the government must demonstrate, by a preponderance of the evidence, both (1) that there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation. United States v. Lamas, 930 F.2d 1099, 1102 (5th Cir. 1991); United States v. Cherry, 759 F.2d 1196, 1205-1206 (1985), cert. denied, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).

In determining whether the officers would have ultimately lawfully seized the evidence, consideration should be given to whether Stiles' consent was voluntarily given. The only evidence presented with respect to the voluntariness of Stiles's consent was his testimony that he had no problem with consenting to the search of his hotel room because he had nothing to hide. We find no clear error in the district court's determination that Stiles's consent was voluntary. However, the government must show that the officers acted within the scope of the consent given.

The search and seizure of the checks was conducted *prior to*, not *pursuant to* Stiles' written consent. The government has cited, and we have found, no authority which renders the subsequent written consent a dispositive factor in determining whether the search and seizure was within the scope of Stiles' pre-seizure consent. The government presented no evidence which indicated that, prior to the seizure, Stiles consented to more than a

11

cursory, visual inspection.[3]  There being no evidence that at the time of the seizure the officers acted within the scope of Stiles' consent, we conclude that the government did not demonstrate that the seizure was justified by Stiles' pre-seizure consent.

It can be argued that Stiles' cooperativeness indicates that the checks would have eventually been discovered by lawful means.  However, application of the "inevitable discovery" rule also requires a showing that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation.  Cherry, 759 F.2d 1196, 1206.  Inevitable discovery cannot rest upon speculation; it must be supported by historical facts that can be verified or impeached.  Lamas, 930 F.2d at 1102.

For example, Cherry held that evidence seized as a result of a warrantless search was not admissible under the "inevitable discovery" doctrine although there was enough probable cause to obtain a warrant because the officer had taken no steps to obtain a warrant at the time of the illegal search.  Cherry, 759 F.2d at 1206.  By contrast, the evidence obtained in Lamas was admissible under the doctrine because the officers entered the house to secure the premises only, there was probable cause to obtain a search warrant, and an officer had left the premises to obtain the warrant at the time of the seizure. 930 F.2d at 1103.

---

[3]  See the discussion, infra, regarding the "protective sweep" exception to the warrant requirement.

12

In the instant case, the only evidence regarding the basis for suspecting Wilson was Inspector McDermott's testimony as follows:

> On April 2nd I was contacted by a confidential informant and the informant told me that Mr. Wilson was at room 129 of the Abrams Inn in Arlington, Texas. I had known from speaking the past -- on prior occasions speaking to other individuals that there was a pretty good chance that Mr. Wilson was also involved in at least the possession of stolen United States mail.

The government concedes that there was no probable cause prior to the instant search and seizure. The only evidence of an alternate line of investigation is Inspector McDermott's testimony that he believed the Dallas police inevitably would have discovered that Mr. Wilson had possessed stolen checks. The inspector testified as follows regarding the basis for his belief:

> There was an incident at a supermarket in Dallas, Texas where one of the Whetstone checks, an individual attempted to cash and forge it at a grocery store. The clerk wrote down a license plate number that came back to a man. And I subsequently followed the chain of events of this. And the individual gave me the name of a woman, I think it was his ex-wife or common-law wife that had access to the car. I contacted her. She told me that Mr. -- she took Mr. Wilson to the grocery store. She didn't know why at the time but remembers taking him to the grocery store to cash a check, get some money.

Inspector McDermott then stated that either he or the Dallas police "would have run the lead down." However, there was no evidence about whether there had been such follow up and, if so, whether there was any corroborating or superseding evidence which linked Wilson to these checks.

13

The inspector testified that he had no probable cause to arrest Wilson when he entered the hotel room. His testimony about what he believed either he or the Dallas police would find upon further investigation does not rise to the level of "historical facts which can be verified or impeached."[4] Because there has been an insufficient showing that the government was *actively pursuing* a substantial alternate line of investigation at the time of this warrantless search and seizure, the checkbook was not admissible under the "inevitable discovery" doctrine.

*Protective Sweep?*

The government argues that the seizure of the checkbook was lawful because it was discovered during a protective sweep of the hotel room. A "protective sweep" is a quick and limited search of a premises, *incident to an arrest* and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. <u>Maryland v. Buie</u>, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The instant search of the hotel room was not made as an incident to an arrest and, therefore, it does fit within the "protective sweep" exception to the warrant requirement.

---

[4] The presentence report contains references to this grocery store incident, as well as to an April 14, 1993 photo identification of Wilson by a grocery store employee. The report notes that "This information was obtained from the investigative notes of Postal Inspector Dave McDermott." Although the hearing on Wilson's motion to suppress was held on November 18, 1993, seven months after this photo identification, the record contains no such evidence.

14

Moreover, under the instant circumstances, the seizure of the checkbook from the wastebasket was not within the narrow ambit of a "cursory visual inspection" of a place where a person could be hiding. See Buie, 494 U.S. at 327.

*Plain View?*

The district court found that the seizure of the checks was lawful because "they were in view so that they were seen by the officer." A plain view seizure requires that (1) the police's initial intrusion be supported by a warrant or recognized exception to the warrant requirement, and (2) the incriminating character of the object seized be immediately apparent. United States v. Coleman, 969 F.2d 126, 131 (5th Cir. 1992) (footnotes omitted). The instant seizure satisfies neither of these requirements.

None of the exceptions to the warrant requirement apply to these facts. The checkbook was not in plain view in the bathroom. Even if it could readily be observed during a cursory visual inspection of the bathroom, the checks themselves were not visible because of the cover. Taking it one step further, even if the checks were not inside a cover, and the names were visible when Sgt. Cowcert looked in the bathroom, the incriminating character of the checks did not become apparent until their stolen nature was verified by the telephone call. The incriminating character of the evidence was not immediately apparent. The checkbook was not admissible under the plain view doctrine.

For the foregoing reasons, we find that the district court erred in finding this seizure to be reasonable and in denying

15

Wilson's motion to suppress the checkbook. Sgt. Cowcert's seizure of the checks was unreasonable and was therefore prohibited by the Fourth Amendment. We turn next to examine whether Wilson's confession was the product of this unreasonable seizure.

III. Suppression of the Statement

Wilson contends that the statement he made at the postal inspection office should have been suppressed because it was fruit of the unreasonable search and seizure of the checkbook. He also argues that his statement was the fruit of an illegal arrest. By contrast, the government contends Wilson's statement is admissible because (1) the search and seizure of the checkbook was lawful and (2) Inspector McDermott had just seen Wilson with stolen mail and therefore had probable cause to arrest him but chose not to. The government further argues that, even assuming that Wilson was under arrest, he was properly placed under arrest and properly Mirandized, therefore, the confession was legally obtained. Having already determined that the checkbook was unlawfully seized, we do not address the government's argument that Wilson's confession is admissible because the seizure was lawful.

In addition to evidence obtained directly from a violation of the Fourth Amendment, the "fruit" of such illegal conduct must be excluded. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, the test is not a "but for" inquiry of causation. Rather, the inquiry is whether the challenged evidence was obtained by exploitation of that illegality or instead by a means sufficiently distinguishable to be

16

purged of the primary taint.  See Wong Sun, 371 U.S. at 488, 83 S.Ct. at 417.

In order for the causal chain between the illegal seizure of the checkbook and Wilson's statement to Inspector McDermott to be broken, the statement must have been voluntary, and "sufficiently an act of the free will to purge the primary taint." United States v. Parker, 722 F.2d 179, 186 (5th Cir. 1983), overruled on other grounds, United States v. Hurtado, 905 F.2d 74 (5th Cir. 1990), citing Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) and United States v. Miller, 608 F.2d 1089, 1102 (5th Cir. 1979), cert. denied, 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980).

In Dunaway v. New York, 442 U.S.# 200, 99 S.Ct. # 2248, 60 L.Ed.2d 824 (1979), the United States Supreme Court addressed the issue of whether a confession, obtained after illegal seizure of the defendant, was sufficiently attenuated to permit its use at trial.  The Court stated the following, 99 S.Ct. at 2259 (citation and footnote omitted):

> [A]lthough a confession after proper Miranda warnings may be found "voluntary" for purposes of the Fifth Amendment, this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis. Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached.

Thus, the fact that the defendant was given Miranda warnings, standing alone, will not prove that the statement was sufficiently an act of free will.  Brown v. Illinois, 95 S.Ct. at 2254; Dunaway v. New York, 99 S.Ct. 2259.

17

> Whether a confession was enough of a product of free will to break the chain will depend on the facts of each case. United States v. Miller, 608 F.2d at 1102. "Factors to be considered, in addition to warnings, are the temporal proximity of the illegality and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrance of the official misconduct." Id.

Parker, 722 F.2d at 186. These factors aid in the determination of whether the government has shown that the primary taint has dissipated. See Richard, 994 F.2d at 252.

When Sgt. Cowcert seized the checkbook, Wilson and the other two occupants of the room denied any interest in the checkbook. At that point, Inspector McDermott still had no probable cause to arrest Wilson, and had no articulated reason to believe that Wilson, rather than Stiles or his girlfriend, was associated with the seized checks. Inspector McDermott then requested that Wilson provide him with a handwriting exemplar, and Wilson volunteered to do so. Inspector McDermott told Wilson that it appeared to him that Wilson had written the checks. Wilson then refused to return the exemplar, and Inspector McDermott told him

that he was not entitled to keep the writing because it was government property.

After the checkbook was seized, after the officers contacted the person to whom the checks belonged, and after Inspector McDermott exerted his authority to compel Wilson to hand over the requested writings, Inspector McDermott informed Wilson that he could either come to the postal inspection office or the

18

local police would be called. Inspector McDermott used the checks and the information obtained by examining the checks to persuade Wilson to provide the handwriting samples. He also used information arising directly from the unlawful seizure to persuade Wilson to accompany him to the postal inspection office. Under these circumstances, the drive to Inspector McDermott's office is, in and of itself, insufficient to constitute an attenuation of the primary taint.[5]

Wilson gave his confession shortly after the inspector's show of authority. Inspector McDermott's behavior was the chain which linked the illegal seizure with Wilson's confession. This chain, i.e., Inspector McDermott's use of his authority, to "encourage" Wilson to provide handwriting samples and to accompany him to the postal inspection office was not broken by any independent or voluntary act on Wilson's part. See and compare, United States v. Webster, 750 F.2d 307, 324-325 (5th Cir. 1984), cert. denied, 471 U.S. 1106, 1055 C. 2340, 83 L.Ed.2d 855 (1985), (factors which include a lapse of 12 hours, car trip with officers away from the crime scene, and additional Miranda warnings, found insufficient to demonstrate that a statement was an act of free will, purged of the taint of an illegal arrest); United States v. Doby, 598 F.2d 1137 (8th Cir. 1979) (confession not the fruit of an

_____

[5] Although we do not reach this issue, we note that a reasonable person in Wilson's position at the time the inspector "invited" Wilson to the postal inspection office would have believed that his "choice" was the police department or the postal inspection office. Under these circumstances, Wilson's decision to go to the postal inspection office appears to be a result of the inspector's earlier show of authority.

19

illegal search because the illegally obtained evidence did not materially affect the decision to confess); <u>United States v. Patino</u>, 830 F.2d 1413 (7th Cir. 1987), (taint not purged where Patino left her home twice: she remained in the presence of government agents and consequently there was no significant break from the initial unlawful entry and search).

We find that Wilson's confession resulted from an exploitation of the illegally seized checks. The questioning that ultimately elicited Wilson's confession occurred with no intervening "act of free will to purge the primary taint" of the unlawfully seized checkbook.[6] Accordingly, we find that Wilson's confession resulted from the illegal seizure and was the "fruit of the poisoned tree". <u>See and compare</u>, <u>Amador-Gonzalez v. United States</u>, 391 F.2d 308, 318 (5th Cir. 1968), <u>overruled on other grounds</u>, <u>United States v. Causey</u>, 834 F.2d 1179 (5th Cir. 1987). Thus the admissibility of the confession falls with that of the checkbook.

CONCLUSION

For the foregoing reasons, the district court's ruling on the motion to suppress is REVERSED and Wilson's conviction is VACATED.

REAVLEY, Circuit Judge, dissenting:

---

[6] Quoting <u>Wong Sun v. United States</u>, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Two officers were invited into the motel room. They identified themselves and looked around. One of them saw a checkbook in the wastebasket; he picked it up and handed it to the other officer. The other officer then obtained a written consent to search the room. The trial judge found no constitutional violation in the initial retrieval of the checkbook from the wastebasket. I agree.

The officers did not at the outset speak of a "search," but they looked around at the contents of the room and encountered no objection. A reasonable officer would have concluded that the invitation from the occupants and the acceptance of their conduct allowed their movement and survey. Cf. U.S. v. Rich, 992 F.2d 502, 505 (5th Cir. 1993). The retrieval of the checkbook from the trash was not an abuse of the manifested consent of the occupants. The reasonableness of that view of the scope of the permission allowed the officers was confirmed by the prompt affirmative response to their inquiry about a "search."

If the conduct of the officers was reasonable to that point, all of the other arguments and questions fall away. I would affirm.