**UNITED STATES of America**

v.

**Kelly Donald GOULD**

**No. CR. 01–105–D.**

United States District Court, M.D. Louisiana.

April 2, 2002.

Joseph R. Streva, Jr., Federal Public Defenders Office for Middle and Western Districts of LA, Lafayette, Jean M. Faria, Federal Public Defenders Office for Middle & Western District, Baton Rouge, for Kelly Donald Gould, defendants.

Mary Patricia Jones, United States Attorney's Office, Middle District of Louisiana, Baton Rouge, for U.S. Attorneys.

### RULING ON DEFENDANTS' MOTIONS TO SUPPRESS AND TO DISMISS INDICTMENT BASED ON MULTIPLICITY

BRADY, District Judge.

This matter is before the court on the defendant's motion (doc. 17) to suppress. This matter is also before the court on the defendant's motion (doc. 33) to dismiss indictment based on multiplicity. The Government has filed an opposition.

### Motion to Dismiss Indictment Based on Multiplicity

The defendant filed this motion to dismiss the indictment based on multiplicity because the original indictment charged him with three separate counts of 18 U.S.C. § 922(g)(1), which is possession of a firearm by a convicted felon.

On January 9, 2002, the Government filed a superseding indictment which only charges the defendant with one count of 18 U.S.C. § 922(g)(1). Therefore, the defendant's motion is moot. This court will dismiss the defendant's motion to dismiss indictment based on mootness.

### Motion to Suppress

The defendant filed this motion to suppress the firearms which are the object of this prosecution and any statements allegedly made by him during his arrest on October 17, 2000. Additionally, the defendant requests that this court determine the voluntariness of any statements pursuant to 18 U.S.C. § 3501.

### Factual Background

On October 17, 2000, the Livingston Parish Sheriff's Office (the "LPSO") received information from John Forehand regarding a plot by the defendant to kill two judges of Louisiana's Nineteenth Judicial District Court in Baton Rouge. Mr. Forehand reported that the defendant also intended to kill police officers and black people. He stated that approximately three to four weeks previously, while at the residence, the defendant had retrieved a twenty-two caliber rifle, equipped with a scope, from his bedroom and showed it to him. Mr. Forehand explained that he worked for the defendant, and that he and Mr. Dennis Cabral lived with the defendant in a mobile home located at 32130 Patti Anne Drive in Denham Springs, Louisiana.

That evening, detectives from the LPSO and the East Baton Rouge Parish Sheriff's Office (the "EBRPSO") met briefly before proceeding to the Patti Anne Drive residence to question the defendant about Forehand's charges. Before they proceeded to the residence, the detectives determined from a criminal history check that the defendant had numerous arrests for violent felonies and resisting police officers. The detectives also received information that, within the last several days, the defendant had been to court and, apparently displeased with the outcome of the proceeding, had made threats against someone. Furthermore, Detective Ard, one of the LPSO detectives assigned to assist the EBRPSO detectives with the questioning of the defendant, was familiar with the defendant because the defendant had been incarcerated in the LPSO jail during the time Det. Ard was employed at the jail. Det. Ard told the rest of the detectives that from his experience at the jail, he was aware that the defendant was a convicted felon and a notoriously violent person.

The detectives then proceeded to the Patti Anne Drive residence, which was a mobile home. The detectives had no search warrant or arrest warrant. The officers knocked on the front door of the mobile home, and Dennis Cabral answered the door. John Forehand was also present inside the mobile home. The detectives told Mr. Cabral that they wished to speak with the defendant.

At this point, the detectives' version of events diverges from Mr. Cabral's version of events. Both versions of events were obtained at an evidentiary hearing of the defendant's motion to suppress on December 19, 2001. The following are the two versions of events, after which this court will analyze the defendant's motion to suppress under both of the two scenarios:

*Detective's Version of October 17, 2000, Search and Arrest*

According to the detectives' version of events, Mr. Cabral stated that the defen-

dant was home, and that he was probably asleep in the master bedroom on the north end of the mobile home. Mr. Cabral also told the detectives that he was currently renting a room in the mobile home from the defendant. The detectives asked if they could come in to see if the defendant was in the mobile home. Mr. Cabral then consented to their entrance into the mobile home.

Detective Brown of the LPSO entered the mobile home and went into the master bedroom pointed out by Mr. Cabral. Detective Brown admitted that he did not ask Mr. Cabral for his consent to enter the bedroom. He searched the bedroom, but he did not find the defendant. When Detective Brown searched in a closet in the bedroom, he observed three firearms inside the closet. Detective Brown did not seize the weapons at that time. Instead, he exited the bedroom and continued to search for the defendant.

Eventually, the detectives located the defendant in the woods behind the mobile home, where he was lying face down under a log. The defendant wearing a pair of athletic shorts, but he was not wearing a shirt or shoes. The detectives handcuffed the defendant, advised him of his rights, and placed him in a police car. They briefly questioned the defendant regarding the firearms found in his closet. The defendant stated that the firearms did not belong to him and that he was holding them for someone else. The detectives then asked for and received his written consent to search the mobile home. At this point, the detectives reentered the mobile home and seized the three weapons in the bedroom closet. The defendant was arrested for possession of a firearm by a convicted felon.

*Mr. Cabral's Version of October 17, 2000, Search and Arrest*

According to Mr. Cabral's testimony at the evidentiary hearing, neither he nor the defendant resided in the mobile home on October 17, 2000. Instead, Mr. Cabral testified that Michael Baumgardner and John Forehand lived in the mobile home. He stated that the defendant used the mobile home as his office for his tree-cutting business. He claimed that the defendant kept a file cabinet for his business in the office area of the mobile home, which was situated near the kitchen and dining room by the desk and the computer. He stated that none of the materials related to the defendant's tree-cutting business were kept in the master bedroom. He also stated that he believed the defendant lived at his residence in Walker, Louisiana, and that Mr. Cabral was currently living in his mother's home on 1620 Fort Jackson Boulevard.

Mr. Cabral claimed that he was in the mobile home on October 17, 2000, because he was finishing up some paperwork related to the defendant's tree cutting business. He testified that when the detectives knocked on the door to the mobile home that evening, he answered the door. He claims that the detectives never asked him if he lived there. He told the detectives that the defendant had either gone jogging or was in the backyard working out. He denies that he ever invited the detectives into the trailer. Finally, he claims that the detectives entered and searched the trailer without ever asking for or obtaining his consent.

*Analysis of Motion to Suppress—The Detectives' Version*

The detectives' version of the events of October 17, 2000, is that Mr. Cabral admitted he lived in the mobile home, and that he invited the detectives to enter the mobile home to look for the defendant. The detectives admitted, however, that they did not have Mr. Cabral's explicit consent to search the master bedroom, which is where the firearms were found. Because

the detectives had no warrant to search the mobile home or to arrest the defendant, the key issues presented to this court by the detectives' version are (1) whether Mr. Cabral had apparent authority to consent to the search of the mobile home; and (2) whether the detectives, once lawfully inside the mobile home, illegally searched the master bedroom.

■ It is well established that law enforcement officers may enter a private residence with the consent of a non-owner third party if the third party has actual or apparent authority to consent. See *United States v. Gonzales*, 121 F.3d 928 (5th Cir.1997). When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained by a third party, the government has the burden of proving that the third party had either actual or apparent authority to consent. *Id.*, at 938. To establish actual authority to consent, the government would have to demonstrate mutual use of the mobile home by the defendant and Mr. Cabral, with both persons having joint access or control for most purposes. *Id.* To establish that Mr. Cabral had the apparent authority to consent, the Government must demonstrate that the detectives reasonably believed that Mr. Cabral was authorized to consent. *Id.* Furthermore, police officers are entitled to rely on representations of persons regarding their authority to consent to warrantless search when circumstances do not render such reliance unreasonable. *Id.*

■ In this case, the original information provided to the LPSO detectives by Mr. Forehand stated that both the defendant and Mr. Cabral lived in the mobile home. This information was bolstered by Mr. Cabral's own admission that he was renting a room from the defendant in the mobile home, and that the defendant lived in the master bedroom. Finally, the fact that Mr. Cabral answered the door at around 10:00 p.m. on a Tuesday night supported the detectives' belief that Mr. Cabral was a resident. Therefore, the detectives' were reasonable in believing that Mr. Cabral was authorized to consent to the search. This court finds that Mr. Cabral had apparent authority to consent to the search of the mobile home.

■ Next, this court must determine whether the detectives illegally searched the closet in the master bedroom. Because there was no indication that Mr. Cabral lived in the master bedroom, he had no apparent authority to consent to a search of the master bedroom. Furthermore, the detectives admitted that they never asked for or obtained Mr. Cabral's consent to search the master bedroom. Instead, the government argues that the detectives were justified in conducting a protective sweep of the master bedroom to make sure that the defendant did not launch an attack on them from that room.

The government cites *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), in which the Supreme Court held that as an incident to arrest police officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. The government fails to address the fact that, in this case, the detectives' search of the master bedroom was not an incident to arrest. Instead, the detectives intended only to question the defendant about the tip they had received from Mr. Forehand. They had no arrest warrant, and they did not arrest the defendant prior to their search of the master bedroom closet.

In *U.S. v. Wilson*, 36 F.3d 1298, 1305–06 (5th Cir.1994), the Fifth Circuit held that "[a] 'protective sweep' is a quick and limited search of a premises, *incident to an*

*arrest* and conducted to protect the safety of the police officers or others." In *Wilson,* a postal inspector and a police officer knocked on the door of a hotel room that they believed contained a suspect in a stolen mail scheme. The officer did not have probable cause to arrest the suspect, however. The officers were invited into the hotel room by the resident of the hotel room, while the suspect remained in the bathroom. After the suspect came out of the bathroom, the officer made a "protective sweep" of the hotel room to insure that no one else was in the hotel room. In the bathroom, the police officer seized a checkbook from a small trash can. The Fifth Circuit held, "[t]he instant search of the hotel room was not made as an incident to arrest and, therefore, it does not fit within the 'protective sweep' exception to the warrant requirement," *Id.*, at 1306.

In this case, as in *Wilson,* the search was not made as an incident to arrest. The detectives' intentions when they entered the mobile home were merely to question the defendant about the information provided by Mr. Forehand. The Fifth Circuit has explicitly restricted the use of the "protective sweep" exception to the warrant requirement to searches incident to arrest. Therefore, the instant search of the closet in the master bedroom does not fit within the "protective sweep" exception to the warrant requirement. The search of the master bedroom, and the search of the closet in which the firearms were found, was illegal.

### Analysis of Motion to Suppress—Mr. Cabral's Version

Mr. Cabral testified that neither he nor the defendant was living in the mobile home on October 17, 2000. Instead, Mr. Cabral stated that the defendant kept his business office in the mobile home. The office area was located near the kitchen and dining area. According to Mr. Cabral, no business materials were kept in the closet in the master bedroom. Mr. Cabral also testified that he was not aware of the defendant conducting any business in the master bedroom.[1]

■ In analyzing the defendant's motion to suppress with regard to Mr. Cabral's testimony, this court must consider whether the defendant has standing to object to the detectives' search of the closet in the master bedroom. The Fifth Circuit has recognized that "[a] defendant bears the burden of establishing standing to challenge a search under the Fourth Amendment—that he has 'a privacy or property interest in the premises searched or the items seized which is sufficient to justify a 'reasonable expectation of privacy therein,'" *United States v. Pierce,* 959 F.2d 1297, 1303 (5th Cir.1992) (citations omitted).

The defendant's post-hearing brief asserts in a footnote that "[a]lthough Cabral testified that Gould did not live at the trailer located at 32130 Patti Anne Drive, he stated that Gould conducted his business in the trailer and, in fact, had a file cabinet which he kept in the office located off of the kitchen area. Clearly, Gould has standing to object to the officers' illegal search of the trailer in which he regularly conducts business." The defendant cites no legal authority to support his conclusion.

■ The Fourth Amendment's protections against arbitrary searches and seizures are presumptively applicable to any

---

1. This court notes that Mr. Cabral testified that he spent the night of October 16, 2000 (the night before the search of the master bedroom) in the mobile home. However, Mr. Cabral stated that he did not know if the defendant spent the night of October 16, 2000, in the mobile home. Mr. Cabral stated that, when he went to bed on October 16, the defendant was still working at the computer. See Cabral, p. 109.

commercial premises an individual may own or use. *U.S. v. Cardoza–Hinojosa,* 140 F.3d 610, 613 (5th Cir.1998); *citing United States v. Blocker,* 104 F.3d 720, 726 (5th Cir.1997). Although the evidentiary burden on the defendant to prove a contravention of his Fourth Amendment rights is the relatively light "preponderance of the evidence" standard, he must demonstrate as an initial matter that he has standing to challenge the government's actions. *Id.* In this case, the government asserts that the defendant lacks standing to contest the detectives' search of the master bedroom closet (and the seizure of the firearms found inside) because he had no expectation of privacy in the closet at the time of the search.

■ The Fifth Circuit utilizes a two-pronged inquiry to determine whether a defendant has the requisite reasonable expectation of privacy to contest the validity of a search under the Fourth Amendment. This determination depends on:

> "(1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and
>
> (2) whether that expectation of privacy is one which society recognizes as reasonable," *Id.,* at 614; citing *United States v. Kye Soo Lee,* 898 F.2d 1034, 1037–38 (5th Cir.1990).

The defendant has failed to present any evidence that tends to establish an actual, subjective expectation of privacy with respect to the closet in the master bedroom. In fact, the defendant's only witness stated that, as far as he knew, none of the bedrooms in the mobile home was the defendant's bedroom. *See Cabral,* at p. 108.

The Fifth Circuit in *Cardoza–Hinojosa* identified the nuclei of factors to be considered in determining the second, objective prong of the determination of whether a defendant has the requisite reasonable ex-

pectation of privacy. These factors include whether the defendant has "a [property or] possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy and whether he was legitimately on the premises," *Id.,* citing *U.S. v. Ibarra,* 948 F.2d 903 (5th Cir.1991).

According to the testimony of Mr. Cabral, which is the only testimony that supports his version of the events of October 17, 2000, the defendant was not a resident of the mobile home, and he was not using the master bedroom for any purpose. Mr. Cabral stated that the defendant was using the kitchen area of the mobile home as the office for his tree-cutting business, but that he was not aware of any office files being kept in the master bedroom closet. Thus, according to Mr. Cabral, the defendant had no possessory interest in the master bedroom of the mobile home.

The issues of whether the defendant had a property interest in the master bedroom or the right to exclude others from the master bedroom are more problematic. Nowhere in Mr. Cabral's testimony does he state who he believed to be the owner of the mobile home. Neither the government nor the defense explicitly asked Mr. Cabral who owned the mobile home. Furthermore, neither the government nor the defense addresses this issue in their briefs. Mr. Cabral did state that the defendant gave Mr. Cabral the authority to be in the mobile home on October 17, 2000. Mr. Cabral also stated that he felt he was authorized to answer the door and to come and go as he pleased that night. See Cabral, at p. 106. But Mr. Cabral said that, as far as he knew, none of the bedrooms in the mobile home belonged to the

defendant. See Cabral, at p. 108. Therefore, the evidence points to the conclusion that the defendant had the right to exclude others from the mobile home, but that he had no property right or right to exclude others from the master bedroom.

Mr. Cabral's testimony does not address whether the defendant exhibited a subjective expectation of privacy that the master bedroom would remain free from governmental intrusion. His testimony also fails to address whether the defendant took normal precautions to maintain privacy. Finally, the defendant appears to have been on the premises legitimately, but there is no evidence that the defendant was ever in the master bedroom.

This court finds that, under Mr. Cabral's version of events, the defendant has failed to demonstrate that he has standing to challenge the government's search of the closet in the master bedroom. The defendant has not established a subjective expectation of privacy with respect to the closet. Furthermore, the defense's only witness denied any knowledge of the defendant ever using the master bedroom for residential or commercial purposes. The mere fact that the defendant maintained an office in the kitchen area of the mobile home, without any evidence that the defendant either resided in or had a property interest in the master bedroom, is insufficient to give him a reasonable expectation of privacy in the bedroom.

*Conclusion*

Thus, this court finds itself faced with an unusual, and rather ironic, choice. If this court accepts the government's version of events, it must find that the detectives conducted an illegal search and grant the defendant's motion to suppress. If this court accepts the defendant's version of events, it must find that the defendant lacks standing to contest the detectives' search of the bedroom closet and deny the defendant's motion to suppress.

In deciding which version of events to accept, this court must determine which version is more credible. The key issue on which the two versions conflict is whether the defendant resided in the master bedroom of the mobile home.

The government's version of events is based on the testimony of Detectives Brown (LPSO), Ard (LPSO)[2], and Kretser (EBRPSO). This court notes that the detectives were sequestered during the evidentiary hearing, so they could not hear each others' testimony. Still, the detectives' testimonies were consistent with each other. Detective Brown testified that Mr. Cabral told them he rented a room in the mobile home from the defendant, and that the defendant was asleep in his bedroom (while he pointed to the master bedroom). See Brown, at p. 12. Detective Ard stated that Mr. Cabral told them that he rented a room in the mobile home from the defendant, and that the defendant was probably in the back room sleeping. See Ard, at p. 54. Detective Kretser did not state whether Mr. Cabral admitted the defendant lived there or not. See Kretser, at p. 78.

Furthermore, Mr. Forehand, when he called the LPSO to report the murder plot earlier that day, had stated that he and Mr. Cabral lived in the mobile home on Patti Anne Drive *with the defendant.* This statement supports the detectives' version of events.

The only witness who testified that the defendant did not live in the mobile home was Mr. Cabral. Mr. Cabral has been the

**2.** Although Mr. Ard was a detective on October 17, 2000, he is currently employed as a training officer.

defendant's friend for five years. According to the information provided by Mr. Forehand, Mr. Cabral was involved in the murder plot to kill the two judges. Furthermore, Mr. Cabral has been convicted of possession of marijuana, felony unauthorized use of a utility trailer, and failure to return leased movables. These facts lead this court to seriously doubt Mr. Cabral's credibility. Although Mr. Cabral's testimony at the evidentiary hearing threatened to remove the defendant's standing to contest the search of the master bedroom, this court believes that Mr. Cabral was attempting to cast doubt over whether the firearms were actually in the defendant's possession by falsely stating that the defendant did not live in the master bedroom.

Based on the above evidence, this court finds that the detectives' version of the events of October 17, 2000, is more credible. The information passed to them by Mr. Forehand stated that the defendant lived in the mobile home. When the detectives arrived late that evening, they found the defendant in the back yard wearing only some jogging shorts without shoes or shirt. The consistent testimony of three detectives, who were sequestered during the evidentiary hearing, is more credible than the testimony of the defendant's friend and partner, who was allegedly involved in the murder plot and who has been convicted of several crimes. Therefore, this court finds that Mr. Cabral consented to the entry of the detectives into the trailer to search for the defendant, and that the defendant was residing in the master bedroom. Because the "protective sweep" was not conducted as an incident to arrest, however, the search of the closet in the master bedroom was illegal.

### Seizure of the Firearms

After the detectives located the defendant in the woods, handcuffed him, and placed him in the back of a police car, the defendant signed a written consent to search form. At that time, the detectives reentered the mobile home and seized the firearms in the closet.

When evidence is obtained pursuant to a consent to search which follows on the heels of a Fourth Amendment violation, the court should consider not only whether the consent itself was voluntarily given, but also whether it was independent of the violation to such a degree as to cause a "break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *U.S. v. Vega,* 221 F.3d 789, 801 (5th Cir. 2000); *quoting United States v. Miller,* 146 F.3d 274, 279 (5th Cir.1998); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Chavez–Villarreal,* 3 F.3d 124 (5th Cir.1993).

▬ To determine whether the defendant's consent was an independent act of free will, and broke the causal chain between the constitutional violation and the consent, this court considers: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct," *U.S. v. Jones,* 234 F.3d 234 (5th Cir.2000); *citing Chavez–Villarreal,* at 128; *U.S. v. Dortch,* 199 F.3d 193, 202 (5th Cir.1999).

▬ In this case, the illegal search of the master bedroom and the consent were not separated by much time. Detective Brown testified that he quickly noticed that the back door was wide open after he determined that the defendant was not in the master bedroom. He stated that he "immediately" began to search for the defendant outside the back door, and "I looked around for him, and, very briefly, within a minute or two, I located him hiding in some woods." See Brown, at p. 14. Detective Brown testified that he asked for and obtained the consent to

search "probably 15 minutes of so, just ballparking it," after seizing the defendant. Id., at p. 17. Detective Kretser stated that "[i]t took us about 25 minutes worth of searching." See Kretser, at p. 81. Thus, both detectives testified that very little time elapsed between the illegal search and the consent.

Turning to the second factor, this court notes that no intervening circumstances occurred between the illegal search and the consent. Once the detectives determined that the defendant was not in the master bedroom, they immediately began searching for him. Once the detectives located the defendant in the woods, they handcuffed him and brought him to the police car. At that time, they obtained his consent to search the mobile home. There were no intervening circumstances that could have broken the causal chain.

The purpose of the illegal search was to locate the defendant for questioning. The detectives also needed to locate the defendant for their own safety, so they could make sure he did not launch a surprise attack from a hidden location. Thus, the detectives' purpose was not flagrantly improper, although the need to question the defendant about the unsupported allegations of Mr. Forehand is not sufficient to break the causal chain.

Based on the above three factors, this court finds that the defendant's consent was not an independent act of free will. Because of the temporal proximity between the illegal search and the consent, and the absence of any intervening circumstances, there was no break in the causal chain sufficient to refute the inference that the evidence was a product of the constitutional violation.[3]

---

3. Since this court finds that the consent was not an independent act of free will, there is no need to determine whether the consent to

### The Defendant's Statements

■ The defendant also requests that this court suppress any statements he made to the detectives that were derived from his arrest on October 17, 2000. When the detectives asked the defendant about the firearms found in the closet in the master bedroom, he allegedly denied that the guns belonged to him, but he admitted that he was keeping the guns for a female friend. See Ard, at p. 57.

But for the illegal search of the closet in the master bedroom, the detectives would not have known about the firearms in the closet. The detectives would not have arrested the defendant if they had not found the firearms in the closet, because they would have had no probable cause that he had committed a crime. The defendant would not have volunteered any information about the firearms if the detectives had never asked him about them. Thus, the statements made by the defendant that were derived from his arrest were the product of an illegal search.

Based on the same analysis utilized above, this court finds that the defendant's statements were not independent of the illegal search to such a degree as to cause a "break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation," Vega, at 801. Therefore, the statements made by the defendant that were derived from his arrest on October 17, 2000, will be excluded by this court.

### Inevitable Discovery

■ Finally, the government argues that the firearms should not be suppressed because they would have been inevitably discovered. In *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81

---

search was voluntary under the six-factor test elucidated in *United States v. Cooper*, 43 F.3d 140, 144 (5th Cir.1995).

L.Ed.2d 377 (1984), the Supreme Court held that the exclusionary rule does not bar the introduction of evidence which was unlawfully seized "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." The Fifth Circuit has established three prerequisites for application of the inevitable discovery rule:

"(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation," *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir.1985).

 The government argues that "[a]s soon as the firearms were discovered during the protective sweep, the officers had probable cause to support a search warrant to seize the weapons," See Government's Post–Hearing Brief, p. 14. The government overlooks the fact, however, that the protective sweep was illegal. Thus, the protective sweep cannot provide the probable cause to obtain the search warrant. In fact, there is no evidence that the firearms would have been discovered by lawful means without the illegal protective sweep. Furthermore, the police were not actively pursuing any alternate line of investigation at the time or the illegal protective sweep. Therefore, the inevitable discovery doctrine does not apply in this case.

The search of the closet in the master bedroom on October 17, 2000, was illegal. The defendant's later consent to another search of the master bedroom was not an independent act of free will. The inevitable discovery doctrine does not apply to this case. The seizure of the firearms was illegal because it was the product of an illegal search. Therefore, the defendant's motion to suppress will be granted with respect to the firearms seized from the closet in the master bedroom of the mobile home on October 17, 2000.

Accordingly, the defendant's motion (doc. 17) to suppress is GRANTED with respect to the firearms seized from the closet in the master bedroom, and is GRANTED with respect to any statements by the defendant that were derived from his arrest on October 17, 2000.

The defendant's motion (doc. 33) to dismiss indictment based on multiplicity is DISMISSED based on mootness.